IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

FILED
MAY 10 2013
CLERK, US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| BOARD OF TRUSTEES, SHEET | ) | |
| METAL WORKERS' NATIONAL | ) | |
| PENSION FUND, | ) | |
| Plaintiff, | ) | Case No. 1:12cv555 |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE VALLEY SIGN | ) | |
| CORPORATION, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In this suit, a multiemployer pension plan seeks withdrawal liability payments from the owner of a withdrawing employer pursuant to the Multiemployer Pension Plan Amendments Act of 1980[1] ("MPPAA"), on the ground that the owner had owned and leased a building to the withdrawing employer. The owner opposes this effort on the ground that his ownership and leasing of the building to the withdrawing employer was merely a passive activity and not a 'trade or business' under the MPPAA. The owner also asserts a fraud claim against the multiemployer pension plan on the ground that a representative of the plan told him that "if your company has no assets, how can you get blood from a stone," implying that the plan would not sue the owner. At issue, therefore, on cross-motions for summary judgment are the following questions:

(i) Whether the owner of a withdrawing employer is liable for the withdrawing employer's withdrawal liability under the MPPAA as a commonly controlled 'trade or business,' where, as here, the owner also engages in unincorporated leasing activity by owning and leasing property to the withdrawing employer; and,

---

[1] 29 U.S.C. §§ 1381 *et seq.*

(ii)     Whether the plan representative's statement to the owner of the withdrawing employer to the effect that "if your company has no assets, how can you get blood from a stone" can serve as the basis for a common law fraud claim.

For the reasons that follow, the first question must be answered in the affirmative and the second in the negative; an individual who owns a closely held corporation may be held liable for the closely held corporation's withdrawal liability under the MPPAA where that individual leases property to the closely held corporation. In addition, the statement by the plan representative cannot serve as the basis for a common law fraud claim.

## I.

Plaintiff Board of Trustees, Sheet Metal Workers' National Pension Fund (the "Fund") is a multiemployer pension plan headquartered in Fairfax, Virginia. The Fund is comprised of the individuals who are fiduciaries with respect to the Fund and collectively sponsor the plan. The Fund brings this suit pursuant to the MPPAA for delinquent withdrawal liability payments that were incurred when defendant Delaware Valley Sign Corporation d/b/a DVS Industries ("DVS"), a New Jersey corporation with a principal place of business in Burlington, New Jersey, ceased operations. Defendant George Kennedy ("Kennedy"), a New Jersey citizen, owned 100% of DVS' stock, as well as all of the stock of defendant corporations Kennedy Holding Corporation, a Delaware corporation with a principal place of business in Burlington, New Jersey, and DVS Industries Kentucky Corporation, also a Delaware Corporation with a principal place of business in Burlington, New Jersey.[2] Kennedy also owned the property located at 112 Connecticut Drive, Burlington, NJ 08016 (the "Property"), which served as DVS' principal place of business. The parties stipulated that Kennedy leased the Property to DVS beginning in 1994

---

[2] It appears that the Fund named all of Kennedy's closely held corporations in a cautionary effort to reach all of his assets. As it happens, there are no assets in those corporations and the liability, if any, must be borne by Kennedy.

and continuing until 2007. Thereafter, from 2007 until August 28, 2008, Kennedy leased the

Property to Kennedy Holding Corporation, d/b/a Nova Sign. In 1996, 1998, and 2000 through

2008, Kennedy took deductions on his federal income tax returns for mortgage interest, repairs,

real estate taxes, and utilities relating to the Property.

Pursuant to collective bargaining agreements with Sheet Metal Workers' International

Association Local Union Nos. 27 and 194, DVS agreed to make contributions to the Fund on

behalf of the employees covered by the collective bargaining agreements. Until 2008, DVS

made all contractually required contributions to the Fund. In the summer of 2008, Kennedy

ceased DVS' operations. Kennedy sold the Property to an unrelated corporation, Eastern

Properties, LLC, which continued to operate a sign company on the Property and employed

DVS' former employees in doing so.

As a result of DVS shutting down its operations, the Fund determined that on August 1,

2008, DVS effected a complete withdrawal from the Fund. The Fund then determined that,

under the MPPAA and the terms of the Fund, DVS' withdrawal liability was $1,200,444.82.

Accordingly, the Fund notified DVS by letter dated February 10, 2009 that DVS was delinquent

in making its first quarterly withdrawal liability payment and that it had 60 days from receipt of

the letter to cure the delinquency.

After receiving the February 10, 2009 letter, Kennedy contacted the Fund's counsel,

Mark Rifkind. In declarations provided in connection with the cross-motions for summary

judgment, Kennedy states that he explained to Rifkind that he was closing DVS, and that he had

sold the business to another Union company. Further, Kennedy, in his declaration, states that

when asked by Rifkind whether he "had any other business or rental properties . . . I told him that

I did not." Kennedy states that he then asked Rifkind "where this was going?" Rifkind

answered "if your company has no assets, how can you get blood from a stone?" According to

Kennedy, he understood that "as meaning that, because the business had no remaining assets, the

Fund would not pursue me or my companies for withdrawal liability."

Neither DVS nor Kennedy has made any withdrawal liability payment to the Fund

pursuant to the withdrawal liability payment schedule. Nor did DVS, pursuant to the MPPAA,

29 U.S.C. §1401(a)(1), initiate an arbitration to challenge the Fund's withdrawal liability

assessment. Accordingly, the Fund brought this suit seeking payment of the sums due pursuant

to the withdrawal liability payment schedule, as well as interest on the sums due, and the Fund's

attorneys' fees and costs associated with collecting the delinquent amounts.

## II.

Summary judgment "is appropriate when 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting Rule

56(c), Fed.R.Civ.P.). The facts must be construed "in the light most favorable to [the non-

movant], and [the court] may not make credibility determinations or weigh the evidence." *Id.*

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). There must "be sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Id.* (quoting *Anderson*, 477 U.S. at 249–50).

## III.

The MPPAA amended the Employee Retirement Income Security Act ("ERISA") to

provide special protections for multiemployer pension plans. A multiemployer plan is a plan to

"which more than one employer is required to contribute" and "which is maintained pursuant to one or more collective bargaining agreements between . . . employee organizations and more than one employer[.]" 29 U.S.C. § 1002(37)(A). The MPPAA provides that an employer has completely withdrawn from a multiemployer pension plan if the employer either (i) permanently ceases to have an obligation to contribute to a multiemployer plan or (ii) permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a). Upon an employer's complete withdrawal, the "employer is liable to the plan in the amount determined under [the MPPAA] to be the withdrawal liability." 29 U.S.C. § 1381(a). In other words, the MPPAA "provides that when an employer withdraws from an ongoing multi-employer pension plan, the employer becomes liable for a proportionate share of the plan's unfunded vested liability." *Teamsters Joint Council No. 83 v. Weidner Realty Assocs.*, 377 F.App'x 339, 342 (4th Cir. 2010).

Under the MPPAA, "all trades or businesses (whether or not incorporated) which are under common control within the meaning of section 1301(b)(1) . . . are considered a single employer." 29 U.S.C. § 1002(37)(B). At issue here is whether an individual who leases property, owned by the individual, to the withdrawing employer, also owned by the individual, is a "trade or business" under 29 U.S.C. § 1301(b)(1). Although the Fourth Circuit has not yet addressed this issue, those circuit and district courts that have done so are in accord that "renting property to a withdrawing employer is 'categorically' a trade or business[.]" *Cen. States, Se. & Sw. Areas Pension Fund v. Messina Products, LLC*, 706 F.3d 874, 881 (7th Cir. 2013).[3] The

---

[3] *See also Cen. States, Se. & Sw. Areas Pension Fund v. Nagy*, --- F.3d ---, 2013 WL 1706413, *5 (7th Cir. Apr. 22, 2013) ("This categorically constitutes a trade or business under common control with the withdrawing employer, which triggers personal liability under § 1301(b)(1)."); *Cen. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 879 (7th Cir. 2011) (holding that partnerships under common control that "owned the lumberyard that was used and leased by [the] withdrawing employer . . . is a 'trade or business' for purposes of the MPPAA"); *Vaughn v. Sexton*, 975 F.2d 498, 503 (8th Cir. 1992) (holding that a trust under common control

categorical approach in this context is both sound and firmly supported by the MPPAA's

purpose, which, simply put, is "to prevent dissipation of assets required to secure vested pension

benefits." *Cen. States, Se. & Sw. Areas Pension Fund v. Ditello*, 974 F.2d 887, 890 (7th Cir.

1992) (internal citations omitted). Congress explained that the MPPAA was necessary because

> withdrawals of contributing employers from a multiemployer pension plan
> frequently result in substantially increased funding obligations for employers who
> continue to contribute to the plan, adversely affecting the plan, its participants and
> beneficiaries, and labor-management relations[.]

29 U.S.C. § 1001a(4)(A). Thus, the categorical approach furthers the MPPAA's purpose

because "leasing property to a withdrawing employer is an economic relationship that could be

used to so dissipate or fractionalize assets[.]" *Ditello*, 974 F.2d at 890. Moreover, as the

Seventh Circuit explained in *Messina Products*,

> where real estate is rented to or used by the withdrawing employer and there is
> common ownership, it is improbable that the rental activity could be deemed a
> truly passive investment. In such situations, the likelihood that a true purpose and
> effect of the 'lease' is to split up the withdrawing employer's assets is self-
> evident.

706 F.3d at 882. Thus, where, as here, an individual leases property that he owns to the

withdrawing employer that he also owns, the individual's leasing activity is a 'trade or business'

under common control, and accordingly, that individual is jointly and severally liable for the

withdrawing employer's withdrawal liability.

---

with a withdrawing employer was liable where it leased real property to the withdrawing
employer); *Bd. of Trustees of W. Conf. of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d
892, 894–95 (9th Cir. 1998) (holding that individual owners of a withdrawing employer who
operated a truck leasing operation were a 'trade or business' under common control); *Pension
Benefit Guar. Corp. v. Don's Trucking Co., Inc.*, 309 F.Supp.2d 827, 831 (E.D. Va. 2004)
(general partnership under common control with withdrawing employer who leased property to
withdrawing employer was liable as a 'trade or business'); *Trustees of Amalgamated Insur. Fund
v. Saltz*, 760 F.Supp. 55, 57 (S.D.N.Y. 1991) ("the rental of property to a corporation under
common control with the property owner/lessor is sufficient to make the rental a trade or
business").

These principles, applied here, point persuasively to the conclusion that Kennedy's leasing activity qualifies as a 'trade or business' under common control and, accordingly, Kennedy is liable for DVS' withdrawal liability. To begin, the parties agree that Kennedy's leasing activity and DVS are under common control; Kennedy owns 100% of DVS and is the sole owner of the Property. And the parties agree that Kennedy leased the Property to DVS. Accordingly, under the categorical approach, Kennedy is jointly and severally liable to the Fund for DVS' withdrawal liability.

Seeking to avoid this result, Kennedy argues (i) that the *Groetzinger*[4] test should be applied instead of the categorical approach, (ii) that under the *Groetzinger* test, Kennedy's leasing activity does not qualify as a 'trade or business,' and (iii) that making Kennedy jointly and severally liable for DVS' withdrawal liability is unjust and will lead to great personal financial hardship. These arguments are not persuasive. To begin with, it is important to note that the case upon which Kennedy chiefly relies for applying the *Groetzinger* test is *Messina Products*. Yet, in *Messina Products*, the Seventh Circuit made clear that although the *Groetzinger* test could be used to determine whether an activity was a 'trade or business,' "renting property to a withdrawing employer is 'categorically' a trade or business[.]" *Messina Products*, 706 F.3d at 881.[5] Thus, the very case on which Kennedy relies makes clear that the categorical approach is appropriate in the circumstances at bar. And the Seventh Circuit has noted that there does not appear to be any appellate authority "holding that an individual under

_____

[4] *Comm'r of Int. Revenue v. Groetzinger*, 480 U.S. 23, 35 (1987) (explicating a test for 'trade or business' under 26 U.S.C. § 162(a)).

[5] *See also Nagy*, 2013 WL 1706413 (making clear that *Messina Products* followed a categorical approach).

common control with a withdrawing employer and who leases property to the withdrawing

employer is not operating a trade or business[.]" *Id.* at 882.

Moreover, were the *Groetzinger* test to be applied, Kennedy's leasing activities would

qualify as a 'trade or business' under common control. In *Groetzinger*, a taxpayer sought to have

his activity as a full-time gambler considered as a 'trade or business' for the purpose of income

tax deductions under 26 U.S.C. § 162(a). 480 U.S. at 26. The Supreme Court held that full-time

gambling could be a 'trade or business,' provided the taxpayer is "involved in the activity with

continuity and regularity and that the taxpayer's primary purpose for engaging in the activity [is]

for income or profit[,]" while a "sporadic activity, a hobby, or an amusement diversion does not

qualify." *Id.* at 35. Circuit courts have applied the *Groetzinger* test to determine whether

activity constitutes a 'trade or business' for the purposes of the MPPAA, outside the context of

leasing property to a withdrawing employer. *See, e.g., Messina Products,* 706 F.3d at 881–82

(applying a categorical test to leasing property to a withdrawing employer, but noting that the

*Groetzinger* test would apply to unrelated real estate activity); *Connors v. Incoal, Inc.,* 995 F.2d

245, 250–251 (D.C. Cir. 1993) (rejecting the requirement that there be an economic nexus

between entities under common control and adopting *Groetzinger* test to determine whether

activity was a 'trade or business'). Under the *Groetzinger* test, an activity is a 'trade or business'

if (i) the activity is performed for the primary purpose of income and profit, and (ii) the activity

is performed with continuity and regularity. *See Groetzinger,* 480 U.S. at 35.

The *Groetzinger* test, applied here, leads inescapably to the conclusion that Kennedy's

leasing activity is a 'trade or business' under the MPPAA. First, it is clear that Kennedy's

leasing of the Property to DVS was performed for the primary purpose of income and profit.

Like the defendants in *Messina Products,* Kennedy "profited directly from the rent payments."

*Messina Products*, 706 F.3d at 883. Second, Kennedy's regular activities with respect to leasing

to DVS, although limited, nonetheless are part and parcel of a trade or business. As the Seventh

Circuit put it, "negotiating leases or researching . . . properties are also 'business or trade

conduct' and should be considered for the 'continuity and regularity' prong of the *Groetzinger*

test." *SCOFBP*, 668 F.3d at 878. And, whether the negotiating was handled by Kennedy or his

accountant is of no significance, as "activities as agents of the [defendant] should be imputed to

the [defendant]." *Messina Products*, 706 F.3d at 884. Moreover, leasing property to a

withdrawing employer stands in sharp contrast to "mere ownership of property," such as

"possession of a property, be it stocks, commodities, . . . or something else, without more[.]"

*Messina Products*, 706 F.3d at 881 (quoting *Cen. States, Se. & Sw. Areas Pension Fund v.

Fulkerson*, 238 F.3d 891, 895–96 (7th Cir. 2001)). Finally, Kennedy's argument that the result

reached here—requiring him personally to pay for the withdrawal liability—is both unduly harsh

and unjust is understandable, but without merit in the face of the clear statutory terms and thus,

the argument is properly addressed to Congress, not to the courts.

In summary, whether the categorical approach or the *Groetzinger* test itself is applied to

the facts of this case, the result is the same: Kennedy's activity in leasing the Property to DVS is

a 'trade or business' under the MPPAA and therefore, Kennedy is jointly and severally liable for

DVS' withdrawal liability.[6]

---

[6] It is perhaps worth noting that a different result might obtain had Kennedy chosen to have the Property held by a separate closely held corporation. In that event, the Property holding corporation would be subject to withdrawal liability instead of Kennedy, assuming, of course, that the Property holding company's corporate veil was not subject to piercing.

## IV.

Analysis next appropriately proceeds to whether plaintiff is entitled to summary

judgment with respect to Kennedy's fraud counterclaim.  Well-settled principles govern Virginia

causes of action for common law fraud.  In Virginia, a plaintiff advancing

> a cause of action for actual fraud bears the burden of proving by clear and
> convincing evidence: (1) a false representation, (2) of a material fact, (3) made
> intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party
> misled, and (6) resulting damage to the party misled.

*Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994).  Pertinent here is the principle

that a "fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on

unfulfilled promises or statements as to future events." *Patrick v. Summers*, 235 Va. 452, 454

(1988) (quoting *Soble v. Herman*, 175 Va. 489, 500 (1940)).  Put simply, "a mere promise to

perform an act in the future is not, in a legal sense, a representation, and a failure to perform it

does not change its character." *Id.*  There is an exception to this general rule where a "fraud

claim may sometimes be predicated on promises which are made with a present intention not to

perform them, or on promises made without any intention to perform them." *Merenstein v. St.*

*Paul Fire & Marine Insur. Co.*, 142 F.App'x 136, 139 (4th Cir. 2005) (quoting *Lloyd v. Smith*,

150 Va. 132, 145 (1928)).  This is because "the promisor's intention—his state of mind—is a

matter of fact.  When he makes the promise, intending not to perform, his promise is a

misrepresentation of *present* fact, and if made to induce the promise to act to his detriment, is

actionable as an actual fraud." *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 677

(1985).  Yet, a plaintiff attempting to prove a promisor's false intent bears the burden of putting

forward "clear, cogent, and convincing proof . . . [that the promisor] had the intent to defraud at

the time he made the promise." *Patrick*, 235 Va. at 456.

These principles, applied here, point persuasively to the conclusion that Kennedy's counterclaim for common law fraud fails as a matter of law. Kennedy has not alleged a false representation of a material fact; instead, Kennedy expressly relies on the exception. He argues that the Fund's counsel's statement "if your company has no assets, how can you get blood from a stone?" was a promise not to pursue a withdrawal liability claim against DVS or himself, and that the Fund never intended to honor this promise. In essence, Kennedy argues that he understood this statement to mean that "because the business had no remaining assets, the Fund would not pursue me or my companies for withdrawal liability." The argument fails because it is clear that the Fund's counsel's statement does not contain any false representation of material fact. Indeed, the statement appears to be, at most, an opinion that the Fund would likely not pursue withdrawal liability claims against a company without any assets. As such, it is not actionable under settled Virginia law principles. The statement contains no promise of future actions nor promise to refrain from future action. At most, the statement is an expression of an opinion that the Fund would be unlikely to pursue claims against companies that had no assets. Nothing in the statement refers to Kennedy himself. In sum, it is clear that there has been no false misrepresentation or promise made without the intention to perform it, and thus the counterclaim for fraud fails. Accordingly, the Fund's motion for summary judgment on Kennedy's counterclaim must be granted.[7]

## V.

It is well-settled law that any "dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 and 1399 . . . shall be

---

[7] Because Kennedy's fraud counterclaim fails as a matter of Virginia law, it is unnecessary to address the Fund's ERISA preemption argument or lack of damages argument.

resolved through arbitration." 29 U.S.C. § 1401(a)(1).[8] The amount of withdrawal liability is

fixed by 29 U.S.C. § 1381(b) and therefore, by its plain terms, § 1401(a)(1) makes

determinations of withdrawal liability subject to arbitration. A withdrawing employer must

initiate arbitration either "within a 60-day period after the earlier of . . . (A) the date of

notification to the employer . . . , or (B) 120 days after the date of the employer's request[.]" 29

U.S.C. § 1401(a)(1). And notice "to one member of the control group constitutes notice to all

members of the group." *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1062 (4th Cir. 1991). If a

withdrawing employer fails to initiate arbitration, then arguments with respect to "its withdrawal

liability are deemed waived." *Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v.*

*BES Servs., Inc.*, 469 F.3d 369, 376 (4th Cir. 2006).

Neither party has sought arbitration and accordingly, Kennedy has waived any objection

to—and indeed, has not objected to—the determination of withdrawal liability by failing to

initiate arbitration. It is clear that the Fund calculated the withdrawal liability pursuant to §

1381, and accordingly, any objection to that calculation was subject to arbitration under § 1401.

Moreover, at least one member of the undisputed control group received notification via the

Fund's Notice and Demand for withdrawal liability in 2008 and therefore, the period for

initiating arbitration has long passed.[9] Accordingly, summary judgment must be granted with

respect to the amount of withdrawal liability.

---

[8] *See also Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 123 (4th Cir. 1991) ("where the issues in dispute fall under provisions explicitly designated for arbitration, arbitration procedure must be followed").

[9] Although DVS received the notification, it is clear that Kennedy had actual notice of the assessment of DVS' withdrawal liability.

## VI.

Under the MPPAA, "any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 . . .)." 29 U.S.C. § 1451(b). Section 1132(g)(2) makes clear that in a suit to recover delinquent payments, such as the suit here, a prevailing multiemployer plan is entitled to (i) the amount of unpaid contributions, (ii) interest on the unpaid contributions, (iii) the greater of either liquidated damages or a second assessment of interest on the unpaid contributions, and (iv) reasonable attorneys' fees and costs.[10]

Here, there is no dispute in the record with respect to the amounts submitted by the Fund in support of its motion for summary judgment. Accordingly, the Fund is entitled to the following amounts:

(i)    The amount of unpaid contributions: $1,200,444.82;
(ii)   The amount of interest on the unpaid contributions:[11] $494,417.37; and,
(iii)  A second amount equal to the interest on the unpaid contributions: $494,417.37.

In addition, the Fund is entitled to reasonable attorneys' fees and costs, and accordingly, the Fund must submit its claim for attorneys' fees pursuant to Rule 54(d)(2)(B), Fed.R.Civ.P.

## VII.

For the reasons stated, the Fund's motion for summary judgment against Kennedy for the withdrawal liability, as well as the interest on the unpaid contributions, in the amount of

---

[10] *See also McDonald*, 946 F.2d at 1065 ("when a fund is successful in a suit to recover delinquent contributions attorneys fees [sic] are mandatory not discretionary").

[11] Interest on unpaid contributions is "determined by using the rate provided under the plan," § 1132(g)(2), and the Fund's agreement sets the interest on unpaid withdrawal liability at 8.5% per annum.

$2,189,279.56 must be granted, and the Fund's motion for summary judgment on the fraud

counterclaim must be granted.  Kennedy's motion for summary judgment must be denied.

An appropriate Order will issue.

Alexandria, VA
May 10, 2013


/s/
—————————————————
T. S. Ellis, III
United States District Judge